UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-62648-BLOOM/Valle

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KENNETH G. KRONOWITZ,

    Defendant.
_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Plaintiff United States of America's ("Plaintiff" or "Government") Motion for Summary Judgment, ECF No. [24] ("Motion"). The Court has carefully considered the Motion, all opposing and supporting submissions, including Defendant Kenneth G. Kronowitz's ("Defendant" or "Kronowitz") response, ECF No. [28] ("Response"), the Government's Reply, ECF No. [30] ("Reply"), the record in this case, the applicable law, and is otherwise fully advised. For the reasons that follow, the Motion is denied.

    **I.**    **BACKGROUND**

On October 23, 2019, the Government initiated the instant action against Kronowitz seeking to collect outstanding civil penalties for his allegedly willful failure to report his financial interest in foreign bank accounts, as required by 31 U.S.C. § 3514 for the years 2005-2010. *See generally*, ECF No. [1] ("Complaint"). Specifically, the Government alleges that Kronowitz failed to properly report his financial interest in the following accounts:

| Account Name | Account Owner | Location | Date Opened | Date Closed |
|---|---|---|---|---|
| Republic 0880 | KG and SM Kronowitz | Cayman Islands | Open as of 2005 | Open as of 2014 |
| Republic 4300 | Capistrano Ltd. | Cayman Islands | 2001 | Open as of 2014 |
| UBS 7227 | Cramo Foundation | Switzerland | October 10, 2005 | 2009 |
| Basler ("BKB") 693 | Cramo Foundation | Switzerland | 2008 | 2010 |

ECF No. [1] ¶ 11. In the Complaint, the Government asserts six counts seeking to reduce to judgment the previously assessed Report of Foreign Bank and Financial Accounts ("FBAR") penalties for each applicable year, pursuant to 31 U.S.C. § 5321(a)(5).

In 1970, Congress enacted the Currency and Foreign Transactions Reporting Act, referred to as the Bank Secrecy Act (BSA), 31 U.S.C. §§ 5311, *et seq*. *See* Pub. L. No. 91-508, 84 Stat. 1114 (1970). The primary purpose of the BSA was to require the making of certain reports that "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." *Id*. § 202. To effectuate this purpose, the BSA directs the Secretary of the Department of Treasury to promulgate regulations requiring the reporting of information from United States persons who have relationships, or conduct transactions, with foreign financial agencies. *See id.* § 241(a) (codified at 31 U.S.C. § 5314). As relevant here, the regulations require "each United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country" to file a FBAR. *See* 31 C.F.R. § 1010.350(a). The FBAR is required "with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." *See* 31 C.F.R. § 1010.306(c).

The authority to assess and collect civil penalties for FBAR requirement non-compliance rests with the IRS. *See* Delegation of Enforcement Authority Regarding the Foreign Bank Account Report Requirements, 68 Fed. Reg. 26489 (May 16, 2003). The BSA did not originally contain a civil penalty provision for failing to comply with the FBAR requirements, *see* Pub. L. No. 91-508,

84 Stat. 1114 (1970), but Congress added one in 1986. *See* Money Laundering Control Act of 1986, Pub. L. No. 99-570, Subtitle H, 100 Stat. 3207, § 1357 (October 27, 1986). FBAR penalties may be either willful or non-willful. *See* 31 U.S.C. § 5321(a)(5).

## II.     MATERIAL FACTS

Based on the parties' respective statements of material facts in support of and in opposition to the Motion, along with the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

### A.  Kronowitz's background, education, and business

Kenneth G. Kronowitz was born on March 21, 1937. He is married to Sybil Kronowitz and has three children. Kronowitz's Opposing Statement of Material Facts ("Def. SOMF"), ECF No. [28-1] ¶ 79; United States' Statement of Material Facts ("Pl. SOMF"), ECF No. [25] ¶ 3.[1] He graduated from the University of Miami with a degree in accounting in 1961. Pl. SOMF ¶ 2. From 1961 to present, Kronowitz has been a licensed certified public accountant ("CPA"). *Id*. ¶ 5. Since becoming an accountant in 1961, Kronowitz has always been a sole practitioner. Def. SOMF ¶ 80. Since 1962, Kronowitz has typically prepared approximately thirty (30) to forty (40) federal income tax returns annually for both individuals and businesses. Pl. SOMF ¶ 6. In order to maintain his CPA license, Kronowitz was required to take at least forty (40) hours of Continuing Professional Education ("CPE") classes annually. *Id*. ¶ 8; *see* ECF No. [25-6]. However, Kronowitz does not recall the FBAR being mentioned in any of the CPE courses he has taken. Def. SOMF ¶ 82. He considers himself to be semi-retired, as he still prepares approximately ten or twelve returns per year for others for money. Deposition of Kenneth G. Kronowitz ("Kronowitz

---

[1] Where a fact is uncontroverted by the opposing party, the Court cites only to the originating Statement of Facts.

3

Dep."), ECF No. [25-2] at 5, p. 17. In 2020, Kronowitz prepared approximately twelve or fifteen returns. *Id*. at 22, p. 85.

Kronowitz obtained clients for his CPA business by referral from attorneys. *Id*. at 6, p. 18. In order to prepare their tax returns, clients provided Kronowitz with their records so that he could enter the information into the returns using a computer program. *Id*. at 6, pp. 18-19. Ms. Kronowitz worked with him in his business for a time but retired from helping him when she had back surgery about twenty years ago. *Id*. at 7, pp. 22-23. Typically, Kronowitz would prepare paper returns for his clients, who would then file them; though recently, Kronowitz has e-filed the returns. *Id*. at 7, pp. 23-24. Kronowitz had never heard of a FBAR before 2011. *Id*. at 15, p. 57.

**B. Investments with Eli Levy**

Kronowitz met Eli Levy, a real estate developer, in the 1970s. Pl. SOMF ¶ 17; Kronowitz Dep. at 30, p. 117. Levy was his client, to whom Kronowitz provided good advice that saved Levy a lot of money in connection with Levy's business. *Id*. As a result, Levy offered Kronowitz the opportunity to invest and acquire small interests in some of his land development projects located in Central and South America and Israel. Pl. SOMF ¶ 18; Kronowitz Dep. at 31, pp. 118-19; ECF No. [28-9]. When he made the investments, Kronowitz did not sign any documents evidencing his investment; rather, Kronowitz testified at his deposition that Levy's

> theory was, he said, what he said to me was, if you think I'm going to screw you, don't even get in these deals. [. . .] Number one, he says, if you think I'm going to screw you, don't get into the deals. But even if something happens, they're all in foreign languages and all this other stuff and I guess, you know, good question, a ton of money to stew in another country, another area. So he says it was a take it or leave it type of deal.

Kronowitz Dep. at 31, pp. 118-20. Levy did not give Kronowitz any receipts or other paperwork to memorialize his investments. *Id*. at 32, p. 125. Rather, Kronowitz wrote down the sale price amounts and basis on a legal pad. *Id*. at 31, pp. 119-20. In conjunction with his investments with

4

Levy, Kronowitz gave Levy his name and his birthdate, and told Levy that if he were to pass, the proceeds should go to his wife. *Id*. at 41, p. 158.

### C. Cramo Foundation, 1210 Trust, Consista, and foreign bank accounts

In 1999, Kronowitz's signature and former office address appeared on a document titled "Management and Administration Agreement," (the "Agreement") regarding the management of an entity called Cramo Foundation ("Cramo"). *Id*. at 38, p. 146. The Agreement purports to be between Kronowitz and an entity named Consista Treuunternehmen ("Consista"), an accounting and trust services company in Liechtenstein, and empowers Consista to manage Cramo on behalf of Kronowitz. Pl. SOMF ¶ 26; ECF No. [25-15]. The Agreement is also signed by Beat Kranz, on behalf of Consista, and as director of Cramo. ECF No. [25-15] at 3. Kronowitz is designated as the beneficial owner of Cramo's assets, and if he is deceased, his wife is the secondary beneficiary. *Id*. at 4-5. Kronowitz testified that he never met Kranz in person, and he does not know how Kranz got the information about him:

> Q. So how did Mr. Kranz get this information?
> A. Not from me. I gave this information to somebody else, but not to him.
> Q. Would you ha[ve] given this information to Eli Lev[y]?
> A. Probably. More than likely.

Kronowitz Dep. at 38, pp. 147-48. Kronowitz acknowledges that he gave his information to Levy, but he did not know that Levy was dealing with Consista. *Id*. at 35, p. 137; 41, p. 158. Kronowitz testified further with respect to the documents:

> A. Fake. Fake comes to mind. I wouldn't put anything past him.
> Q. If these are fake documents, how are you able to withdraw the funds from these accounts?
> A. I never saw these. All I know is I was told to call Beat Kranz at Consista. I don't know who, what these others are.

*Id*. at 39, p. 150. Kronowitz does not remember seeing or signing the documents, though he acknowledges his signature appears on them. *Id.* at 37-38, pp. 145-47.

5

Kronowitz was told sometime in 2000 that all the professionals were taking their money offshore in order to protect assets. *Id*. at 16, pp. 58-59. In his practice, however, he did not have clients in a position to move assets offshore. *Id*., p. 61. Around 2001, Kronowitz and his wife stopped in the Cayman Islands during a cruise. Def. SOMF ¶ 105. While there, Kronowitz opened an account. *Id*.[2] Kronowitz opened bank accounts in the Cayman Islands in order to protect his assets because he heard rumors that one of his clients, Irwin Mogerman, was going to sue him. Kronowitz Dep. at 16, p. 58; ECF No. [25-20]. Kronowitz was "the only one in charge of the Cayman Accounts and for anyone else to get them, they have to produce a death certificate or a record to prove incapacity." ECF No. [25-11]. The lawsuit initiated by Mogerman arose from Kronowitz's filing income tax returns on behalf of Mogerman's corporations for tax year 1998, and in 2005, resulted in the entry of judgment against Kronowitz for breach of contract and fraudulent misrepresentation. Pl. SOMF ¶ 15.

On October 10, 2005, Cramo opened an account with UBS AG, for which Kronowitz was listed as the beneficial owner on the account opening paperwork. Pl. SOMF ¶¶ 29-30. By 2008, Kronowitz's investments with Levy had resulted in significant gains, and Kronowitz received information regarding those investments and the income derived from them. Pl. SOMF ¶ 35; ECF No. [25-20]. According to Kronowitz, he was told to contact Consista regarding the investment funds, and first became aware that he had money in Switzerland at that time. *Id*.; Def. SOMF ¶ 98. Kronowitz contacted Consista and had his investment proceed funds transferred to his bank account in the Cayman Islands in 2008, 2009, and 2010. ECF No. [25-20]; Kronowitz Dep. at 35, p. 137. Also in 2008, Kronowitz set up a trust, the 1210 Trust (the "Trust"), to protect the assets received from his investments with Levy. Pl. SOMF ¶ 36. Kronowitz Dep. at 23, p. 86; 27-28, pp.

---

[2] One bank account was opened between 2001 and 2004, but by 2005, there were two Cayman Islands bank accounts – one in the Kronowitzs' name and one in the name of Capistrano, Ltd. Def. SOMF ¶ 105 n.1.

105-06. The Trust's assets held in its bank account were comprised solely of transfers from the Cayman Islands accounts. Pl. SOMF ¶ 37.

When Kronowitz contacted Consista, he spoke to Kranz's office, and may have spoken to Kranz himself once or twice, but he mostly communicated via e-mail. Kronowitz Dep. at 36, p. 138; 198. On March 27, 2009, Cramo opened an account at Basler Kantonalbank ("BKB") with Kronowitz listed as the beneficial owner. Pl. SOMF ¶¶ 31-32. Following the establishment of the BKB account, the balance from the UBS account was transferred to BKB, and the UBS account was closed. *Id*. at ¶ 34. In spite of being listed as the beneficial owner on both the UBS and BKB account opening documents, Kronowitz asserts that he did not know that funds were being held for his benefit at these banks until the IRS audit. Def. SOMF ¶ 100; Kronowitz Dep. at 20, pp. 75-76. On December 6, 2010, Kronowitz e-mailed Consista and instructed them to liquidate his account and forward the funds to his account in the Cayman Islands. Pl. SOMF ¶ 59. On December 29, 2010, Cramo wired $318,067.53 from the Cramo BKB account to a Cayman Islands account. *Id*. ¶ 61; Def. SOMF ¶ 61. Cramo was terminated on February 22, 2011, after Kronowitz withdrew all his funds. Kronowitz Dep. at 42, p. 163; 46, p. 179; ECF No. [25-19].

**D. Reporting income from foreign sources**

Kronowitz prepared his own tax returns for tax years 2005, 2006, 2007, 2008, 2009, and 2010. Kronowitz Dep. at 23, p. 88; 24, at pp. 92-93; 25, at p. 96; ECF No. [25-22]; ECF No. [25-4] at 2-3. On the Schedule B forms filed with the 2007 and 2008 tax returns, in response to question 7a,[3] Kronowitz marked "no." Kronowitz Dep. at 24, pp. 91, 93. There were no Schedule B forms attached to the 2006, 2009, or 2010 individual tax returns. ECF No. [25-22]; ECF No. [25-4] at 6.

---

[3] Question 7a on Schedule B states, "At any time during [applicable year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?
See page B-2 for exceptions and filing requirements for Form TD F 90-22.1."

Kronowitz also prepared the tax returns for the Trust for tax years 2008, 2009, and 2010. Kronowitz Dep. at 28, p. 109; 31, p. 121; 32, p. 123. He marked "no" in response to question 3 under the "Other Information" section on Form 1041, which states, "[a]t any time during calendar year [ ], did the estate or trust have an interest in or a signature or other authority over a bank, securities, or other financial account in a foreign country?" Kronowitz Dep. at 28-29, pp. 109-10. At his deposition, Kronowitz admitted that while he may have made a mistake, he did not research whether the Trust was required to disclose its interest in foreign assets:

> Q. So how did you come to the conclusion that this trust was not required to disclose its interest?
> A. Like I say, I may have made a decision to lack of knowledge as opposed to anything else. It seems to me I made a mistake.
> Q. Did you ever research this question?
> A. Not really. Not that I remember.
> Q. Did you ever ask anyone at the AICPA or anything like that?
> A. No, why would I?
> Q. Did you ever ask your legal counsel Max Hagen about this question?
> A. No, not that I remember.

*Id*. at 29, pp. 110-11. Kronowitz explained that "I presume whoever sent me the information knew what I needed for Schedule D reporting purposes." Kronowitz Dep. at 198. He also assumed that as long as the income was reported on the Trust's tax return (the Form 1041), he had complied with his reporting obligations. *Id*. at 17, p. 62; 197; ECF No. [25-20] at 1.

In 2008, Kronowitz disclosed $370,000.00 in gains from investments allegedly in Brazil, Panama, and Israel. Pl. SOMF ¶ 47. In 2009, Kronowitz disclosed $281,725.00 in gains from investments allegedly in the Cayman Islands and Brazil. *Id*. ¶ 48. In 2010, Kronowitz disclosed $296,218.00 from investments allegedly in foreign countries. *Id*. ¶ 49. However, beyond writing the names of certain of the Levy investments on the 2008, 2009, and 2010 Trust tax returns, Kronowitz did not disclose his interest in any foreign accounts or assets. *Id*. ¶ 5; Kronowitz Dep. at 30, p. 115. Kronowitz insists that he did not look up Form TD F 90.22.1 (the FBAR) due to a

8

mistaken lack of knowledge, not a "desire to cheat the government." Kronowitz Dep. at 29, pp. 111, 113.

### E. IRS examination and penalty assessment

Following an examination, the Internal Revenue Service ("IRS") determined that Kronowitz failed to file FBARs disclosing his interest in foreign accounts during 2005 through 2010, and that the violations were willful. Pl. SOMF ¶ 74. On November 1, 2017, the following penalties were assessed:

| Calendar Year | FBAR Penalty |
| --- | --- |
| 2005 | $141,667 |
| 2006 | $140,066 |
| 2007 | $145,063 |
| 2008 | $76,781 |
| 2009 | $82,504 |
| 2010 | $77,960 |
| | **Total Penalties Assessed: $663,771** |

Kronowitz was provided notice of the FBAR penalty assessments, which remain unpaid. *Id.* ¶¶ 77-78. In addition to the amount of the assessments, interest and failure to pay penalties have accrued; and as of August 12, 2020, the balance owed on the FBAR penalties, including accruals, is $791,742.63. *Id.* ¶ 78.[4]

### III. LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including,

---

[4] Kronowitz contends that his cognitive abilities have been failing for the past three to four years, most notably affecting his memory. *See* Def. SOMF at 8-9. The Government disputes this contention and argues that Kronowitz's current alleged cognitive issues are irrelevant and have no bearing on Kronowitz's actions fifteen years ago. *See* the United States' Reply Statement of Material Facts, ECF No. [31], ECF No. [30] at 9. Although sympathetic to Kronowitz's declining health, Kronowitz' current decline is only relevant to the extent that it may potentially affect his testimony and related credibility issues.

*inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs.*, L.L.C., 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343.

In resolving the issues presented under Fed. R. Civ. P. 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, No. 08-80113-CIV, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913 (11th Cir. 1993)). Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

In particular, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, No. 13-60820-CIV, 2013 WL 5596114, at *4 (S.D. Fla. Oct.11,

2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

## IV. DISCUSSION

The Government moves for summary judgment, arguing that the undisputed facts demonstrate that Kronowitz's FBAR violations were willful, in that he recklessly failed to report his interest in his foreign accounts or was willfully blind to the obligation.[5] In response, Kronowitz argues that whether the failure to file a FBAR is willful is a question of one's state of mind, and is to be determined by the trier of fact at trial. Moreover, Kronowitz contends that the Government has failed to establish the absence of a genuine issue of material fact.

In order to be subject to a willful FBAR penalty, the following elements are required: (1) the person must be a U.S. citizen, (2) the person must have or had an interest in, or authority over a foreign financial account, (3) the account had a balance exceeding $10,000.00 at some point during the reporting period, and (4) the person must have willfully failed to disclose the account and file a FBAR. 31 U.S.C. § 5314; 31 C.F.R. § 1010.350(a). The statutes and regulations at issue in this case do not define the term willful; however, the BSA identifies the applicable penalty as a "civil money penalty." 31 U.S.C. § 5321(a)(5)(A). "[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). Indeed, in the context of a FBAR violation, actual knowledge of the duty to report interest in a foreign account is not required—reckless or careless disregard of that statutory duty is sufficient. *United States v. Brandt*, No. 17-80671-CIV, 2018 WL 1121466, at *4 (S.D. Fla. Jan. 24, 2018); *United States v.*

---

[5] The Government also argues that Kronowitz's claim that the penalty amount is subject to a regulatory cap also fails. However, in his Response, Kronowitz asserts that he does not dispute that the amount of the FBAR penalty is not capped. *See* ECF No. [28] at 1 n.1.

*Williams*, 489 F. App'x 655, 658 (4th Cir. 2012) (same); *Norman v. United States*, 942 F.3d 1111, 1115 (Fed Cir. 2019) (willfulness in the FBAR context includes recklessness).

"While the term recklessness is not self-defining, the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco*, 551 U.S. at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed 2d 811 (1994)) (internal quotations omitted); *see also Bedrosian v. United States*, 912 F.3d 144, 153 (3d Cir. 2018) (stating that findings regarding "subjective motivations and the overall 'egregiousness'" of taxpayer's conduct "are not required to establish willfulness" in the context of objective recklessness standard); *United States v. McBride*, 908 F. Supp. 2d 1186, 1204 (D. Utah, 2012) ("An improper motive or bad purpose is not necessary to establish willfulness in the civil context."). In the FBAR context, willfulness "may be proven 'through inference from conduct meant to conceal or mislead sources of income or other financial information,' and it 'can be inferred from a conscious effort to avoid learning about reporting requirements.'" *Williams*, 489 F. App'x at 658 (quoting *United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir. 1991)); *United States v. Bohanec*, 263 F. Supp. 3d 881, 888-89 (C.D. Cal. 2016) (holding that willfulness under § 5321 can be shown through "reckless disregard of a statutory duty"). In addition, "'willful blindness' may be inferred where 'a defendant was subjectively aware of a high probability of the existence of a tax liability and purposefully avoided learning the facts pointing to such liability.'" *Williams*, 489 F. App'x at 658 (quoting *United States v. Poole*, 640 F.3d 114, 122 (4th Cir. 2011)).

### A. Willfulness is an issue of fact

In the Motion, the Government argues the Kronowitz's FBAR violations were willful because he recklessly failed to report his interest in foreign accounts or was willfully blind to the

FBAR requirement. In support of its argument, the Government contends that the facts establish that Kronowitz recklessly opened the Cayman Island accounts to hide assets, that he recklessly managed the UBS and BKB bank accounts in Switzerland, and that his repatriation of funds into the United States and reporting of gains on the Trust tax returns formed part of a scheme to protect his foreign investment gains, which required planning, direction, and knowledge of international taxes and management of wired funds across international borders. Thus, the Government argues, "[i]t is implausible that Kronowitz could have known how to operate this process . . . without ever seeing the FBAR requirement." ECF No. [24]. Upon review, the Government's argument itself demonstrates why summary judgment is inappropriate in this case.

First, contrary the Government's suggestion, upon summary judgment, the Court views the facts in the light most favorable to Kronowitz and draws inferences from those facts in favor of Kronowitz as the non-moving party. *Crocker*, 886 F.3d at 1134. Unsurprisingly, Kronowitz disputes that his actions comprised any scheme to "cheat the government," and insists that he was simply mistaken. Significantly, in order to make the determination, the Court would be required to weigh the evidence and consider Kronowitz's credibility, which it may not do at summary judgment. *Strickland*, 692 F.3d at 1154.

In arguing that summary judgment is appropriate in this case, the Government relies primarily upon the Fourth Circuit's opinion in *Horowitz*, in which the court stated that "willfulness based on recklessness is established if the defendant '(1) clearly ought to have known that (2) there was a grave risk that an accurate FBAR was not being filed and if (3) he was in a position to find out for certain very easily.'" *United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020) (quoting *Bedrosian*, 912 F.3d at 153).[6]

---

[6] In *Horowitz*, the court determined that, despite their contentions regarding their subjective intent, the defendant taxpayers' failure to file FBARs was objectively reckless. 978 F.3d at 89.

14

However, the Government's reliance is misplaced for the simple reason that the district court in *Horowitz* was considering cross motions for summary judgment. Similarly, the other cases relied upon by the Government do not support the conclusion that it urges here—that the Court may determine the issue of willfulness as a matter of law upon summary judgment. *See United States v. Williams*, No. 1:09-cv-437, 2010 WL 3473311, at *1 (E.D. Va. Sept. 1, 2010) (finding no willfulness following bench trial), *rev'd* 489 F. App'x at 660; *Bedrosian*, 912 F.3d at 148 (same); *Bohanec*, 263 F. Supp. 3d at 888-89 (finding willfulness following bench trial).

Moreover, whether Kronowitz was willfully blind based upon the facts in this case requires a determination of his subjective awareness and whether he purposely avoided learning the facts pointing to liability. *Williams*, 489 F. App'x at 658 (citation omitted). "As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991). Indeed, "[w]hether a person has willfully failed to comply with a tax reporting requirement is a question of fact." *Williams*, 489 F. App'x at 658.

### B. Genuine issues of material fact remain as to willfulness

Second, in this case, genuine issues of material fact bearing upon the issue of willfulness remain. In pertinent part, although it is undisputed that Kronowitz has been a licensed CPA for fifty-nine years, has prepared returns on behalf of both companies and individuals during the course of his career, and was required to attend CPE courses, Kronowitz testified that he did not deal with foreign tax issues for his clients, he did not remember any of the CPE courses mentioning the FBAR, and he was unaware of the FBAR until 2011.[7] In addition, Kronowitz testified that he did not remember seeing or signing documents regarding the establishment of Cramo or either

---

[7] Moreover, the Government has pointed to no authority supporting the proposition that the Court may find Kronowitz's violations to be willful simply because he was a CPA.

Swiss bank account; he did not give his personal information to Kranz, whom he has never met; that he did not know that funds were held for his benefit in the UBS and BKB accounts in Switzerland until the IRS audit; and he believed that he was complying with his tax reporting obligations as long as he reported the proceeds from the Levy investments in the Trust's tax returns. Thus, whether Kronowitz "clearly ought to have known" that he was failing to satisfy his obligation to properly disclose his interest in foreign accounts is a genuine issue of material fact. Similarly, whether he knew of the FBAR requirement and purposely avoided learning about it remains a genuine issue of material fact.

As such, the Government is not entitled to summary judgment on the issue of willfulness. *See United States v. Zwerner*, No. 13-22082-CIV-ALTONAGA/O'Sullivan, 2014 WL 11878430, at *3 (S.D. Fla. Apr. 29, 2014) (denying summary judgment on issue of willfulness); *United States v. Cohen*, No. CV 17-1652-MWF (JCx), 2019 WL 8231039, at *1 (C.D. Cal. Dec. 16, 2019) (same); *United States v. Schwarzbaum*, No. 18-cv-81147-BLOOM/Reinhart, 2019 WL 3997132, at *4 (S.D. Fla. Aug. 23, 2019) (same).

### V. CONCLUSION

Accordingly, the Government's Motion, **ECF No. [24]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on January 8, 2021.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record