UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-62648-BLOOM/Valle

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KENNETH G. KRONOWITZ,

    Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court following a two-day bench trial held on February 23 and February 24, 2021. ECF Nos. [45], [46]. The Court has carefully considered the testimony of Tracy Falkowitz, Sybil Kronowitz, and Kenneth Kronowitz, and other evidence presented at trial, ECF Nos. [48-1] – [48-9], the record in the case, and the applicable law. Set forth below are the Court's relevant findings of fact and conclusions of law.

### I.  INTRODUCTION

This case involves an attempt by the United States of America ("Government") to collect outstanding civil penalties against Defendant Kenneth G. Kronowitz ("Defendant" or "Kronowitz") for his willful failure to report his financial interest in foreign bank accounts, as required by 31 U.S.C. § 3514 for the years 2005-2010. *See generally*, ECF No. [1] ("Complaint"). Specifically, the Government alleges that Kronowitz failed to properly report his financial interest in the following accounts:

| Account Name | Account Owner | Location | Date Opened | Date Closed |
|---|---|---|---|---|
| Republic 0880 | KG and SM Kronowitz | Cayman Islands | Open as of 2005 | Open as of 2014 |

| Republic 4300 | Capistrano Ltd. | Cayman Islands | 2001 | Open as of 2014 |
| UBS 7227 | Cramo Foundation | Switzerland | October 10, 2005 | 2009 |
| Basler ("BKB") 693 | Cramo Foundation | Switzerland | 2008 | 2010 |

ECF No. [1] ¶ 11. In the Complaint, the Government asserts six counts seeking to reduce to judgment the previously assessed Report of Foreign Bank and Financial Accounts ("FBAR") penalties for each applicable year, pursuant to 31 U.S.C. § 5321(a)(5), as well as interest and late payment penalties and associated fees. The IRS assessed penalties against Kronowitz for 2005 through 2010 in the amount of $663,771.00.[1]

## II.    FINDINGS OF FACT

### A. Kronowitz's background, education, and business

Kronowitz was born in 1937 in Chicago, Illinois. He graduated high school at Miami Beach Senior High School, and then obtained a bachelor's degree in accounting from the University of Miami in 1961. While in college he met his wife, Sybil Kronowitz, with whom he has three children. After graduating from college, Kronowitz worked for an accounting firm for two years and then began his own accounting practice, with his wife as secretary and data entry person. Since then he was always been a sole practitioner. His clients in general were individuals and small local businesses.

Kronowitz initially obtained his certified public accountant ("CPA") certification by passing several exams and fulfilling a two-year work requirement at an accounting firm. In order to maintain his CPA certification, he was required to participate every two years in eighty (80) hours of continuing professional education ("CPE"). During the course of his career, he took CPE

---

[1] As of October 18, 2019, the total owed, including interest and assessed penalty fees was $753,680.37. ECF No. [1] ¶ 30.

2

courses such as Tax Shelter Seminar, Foreign Taxation, Offshore Trusts, and Asset Protection/Est[ate] Pl[an]ning. He does not recall the FBAR being specifically mentioned in any CPE class. He does recall attending a course given by a University of Miami lecturer during which the movement of assets offshore for protection of those assets was discussed. Kronowitz now maintains his CPA license on an honorary basis and is an honorary member of the American Institute of Certified Public Accountants and the Florida Institute of Certified Public Accountants.

Kronowitz was a professional tax preparer and has been preparing tax returns since 1961 or 1962. For the majority of his career, he prepared between thirty (30) and forty (40) tax returns per year. He began to wind down his practice in 2008 because of his declining health. Nevertheless, as recently as 2020, he was preparing tax returns for others for money. Indeed, for tax years 2019 and 2020, he prepared approximately ten (10) to fifteen (15) federal income tax returns each year. In his tax preparation practice, he prepared 1040s (personal returns) and 1120s (corporate returns) for subchapter S corporations. He also prepared his own tax returns.

### B. Investments with Eli Levy, Caymans Islands accounts

Eli Levy, a real estate developer, was a client of Kronowitz's beginning in the 1970s. Kronowitz did Levy's Florida business returns but did not handle his personal returns or anything in other countries. However, Levy did give Kronowitz the opportunity to buy one or two percent of a couple of projects in different countries as a reward for good service. Kronowitz knew he was investing in properties in different countries.

Kronowitz invested with Levy mostly in the 1970s. He would meet with Levy in person and give him a check for the investment. In return, Levy did not give him any statement or confirmation of the investment because the documents were in foreign languages. In addition, according to Kronowitz, Levy told him that if he thought Levy was trying to "screw" him, then he

should not invest with Levy. Nevertheless, Kronowitz invested with Levy because he had a good feeling about Levy. Kronowitz never signed anything for Levy (other than the checks he gave Levy). Kronowitz's only record of his investments with Levy was a yellow legal pad on which he kept notes on the basis of the investments. Kronowitz does not have the yellow legal pad anymore.

Based upon Kronowitz's attendance at the CPE course in which he remembers being advised that professionals should move assets offshore for protection, and a rumor that a former client, Irwin Mogerman, was going to sue him for fraud related to his work for Mogerman's company Grand Prix Race-o-Rama, Kronowitz opened two bank accounts in the Cayman Islands in 2001 ("Cayman Accounts"). Kronowitz had signature authority and was the financial beneficiary of the Cayman Accounts. His purpose in opening the Cayman Accounts was to keep funds out of reach from potential creditors.

### C.  Cramo Foundation, Consista, and the 1210 Trust

In 1999, Kronowitz's signature and former office address appeared on a document titled "Management and Administration Agreement," (the "Agreement"), ECF No. [48-8], regarding the management of an entity called Cramo Stiftung/Foundation ("Cramo"). The Agreement is between Kronowitz and an entity named Consista Treuunternehmen ("Consista"), a company in Liechtenstein, and empowers Consista to manage Cramo on behalf of Kronowitz. The Agreement is also signed by an individual named Beat Kranz, on behalf of Consista, and as director of Cramo. Kronowitz is designated as the beneficial owner of Cramo's assets, and if he is deceased, his wife is the secondary beneficiary. Kronowitz testified that he does not know what Cramo Stiftung or Cramo Foundation is, and he never met Beat Kranz. Kronowitz testified that he may have spoken to Kranz once or twice on a phone call. Kronowitz gave his personal information to Levy, including his wife and children's names and birth dates, and believes that Levy must have given that

information to Consista. Although Kronowitz does not remember signing any documents for Levy or for Consista, his signature appears on the Agreement. ECF No. [48-8] at 3.

On October 10, 2005, Cramo opened an account at United Bank of Switzerland ("UBS"), for which Kronowitz was listed as the beneficial owner on the account opening paperwork. Kronowitz was the beneficiary of the account held at UBS by Cramo from 2005 to 2009.

By 2008, Kronowitz's investments with Levy had generated significant gains. In order to protect and manage the gains, Kronowitz created the 1210 Trust ("Trust"). In 2008, someone associated with Levy contacted Kronowitz and told him to contact Consista to direct where Kronowitz wanted the proceeds from his investments with Levy sent. In response, Kronowitz contacted Consista and instructed them to send the proceeds to one of his Cayman Accounts. He called the Caymans bank to verify that the wire transfers from Consista were completed. The Trust's assets in its bank account were comprised solely of transfers from Kronowitz's Cayman Accounts. Nevertheless, the Trust did not own the Cayman Accounts. Kronowitz used the information on the yellow legal pad to report the gains from his investments with Levy on his Trust's tax returns.

On March 27, 2009, the funds held by Cramo at UBS were transferred to an account at Basler Kantonalbank ("BKB"), which was opened for Kronowitz's benefit. Kronowitz was identified as the beneficial owner of the account. All correspondence from the BKB account were directed to Consista.

On August 11, 2009, Kronowitz sent correspondence to an individual with initials "R.Z." and directed R.Z. to transfer $300,000.00 "to my account. You have the information on file." ECF No. [41] at 14, ¶ 56; *see also* ECF No. [48-9].

Finally, on December 6, 2010, Kronowitz e-mailed Consista and instructed them to "liquidate my account and forward all moneys as you did before to my account in the [C]aymans." *Id*. ¶ 57. On December 29, 2010, Cramo wired $318,067.53 to the Cayman Accounts.

### D. Reporting income from foreign sources

Kronowitz prepared his own tax returns for tax years 2005, 2006, 2007, 2008, 2009, and 2010. Schedule B is an attachment to the individual federal income tax return (Form 1040) that is used for reporting interest and dividend income, as well as any financial interest in, or signature authority over, financial accounts located in foreign countries. *See* ECF No. [41] at 9, ¶ 17. Kronowitz was required to file a Schedule B in conjunction with his 2005 through 2010 individual income tax returns; however, Kronowitz did not disclose his financial interest in foreign accounts in a Schedule B or in an FBAR for his 2005 through 2010 individual tax returns. In fact, on the Schedule B form filed with his 2008 tax return, in response to the question asking "[a]t any time during 2008, did you have an interest in or signature or other authority over a financial account in a foreign country, such as a bank account, securities account or other financial account?" Kronowitz marked "no." *Id*. at 10, ¶ 21. Furthermore, there were no Schedule B forms attached to the 2005, 2006, 2009, or 2010 individual tax returns.[2] Kronowitz testified that he has probably seen hundreds of Schedule Bs over the course of his career, but admitted that he probably did not read the instructions to Schedule B because he is an accountant and not an attorney. In addition, he stated that he was more concerned with taking care of his clients and providing for his family.

Kronowitz also prepared the tax returns for the Trust for tax years 2008, 2009, and 2010. He marked "no" in response to the question asking, "[a]t any time during [the] calendar year [ ],

---

[2] While not specifically addressed at trial, the Court noted at the summary judgment stage that Kronowitz testified at his deposition that he also marked "no" for the question regarding foreign accounts on Schedule B filed with his 2007 tax return. *See* ECF No. [37] at 7; ECF No. [25-2] at 24, p. 91.

6

did the estate or trust have an interest in or a signature or other authority over a bank, securities, or other financial account in a foreign country?" On the 2008 Trust tax return, Kronowitz disclosed $370,700.00 in gains from investments from Brazil, Panama, and Israel. On the 2009 Trust tax return, Kronowitz disclosed $281,725.00 in gains from investments in the Cayman Islands and Brazil. On the 2010 Trust tax return, Kronowitz disclosed $296,218.00 in gains from investments in foreign countries. However, beyond writing the names of certain of the Levy investments on the 2008, 2009, and 2010 Trust tax returns, Kronowitz did not otherwise disclose his interest in any foreign accounts or assets. *See* ECF No. [48-6].

Although required to do so, Kronowitz admits that he did not timely file FBARs for tax years 2005 through 2010. In preparing tax returns, Kronowitz was aware of the question asking about interests in foreign accounts, but he did not do any research, nor did he look up form number TDF90-22.1 (the FBAR) referenced in the returns. He testified that he had not heard of the FBAR and that he had no knowledge that he was a beneficiary of the UBS and BKB accounts, until he hired an attorney to represent him before the IRS during an audit in 2011. Kronowitz believed that if he reported the income from a foreign source on the Trust tax returns, he had complied with his tax obligations. He never asked anybody about this assumption—he thinks he heard it at a seminar or read it somewhere. He did not see a difference in reporting the income on the Trust return or on his individual return as long as the amounts were reported and the taxes paid.

According to Kronowitz's testimony at trial, he now knows this was a mistake.

### E.  IRS examination and penalty assessment

Following an examination, the Internal Revenue Service ("IRS") determined that Kronowitz failed to file FBARs disclosing his interest in foreign accounts during 2005 through

2010, and that the violations were willful. On November 1, 2017, the following penalties were assessed:

| Calendar Year | FBAR Penalty |
|---|---|
| 2005 | $141,667.00 |
| 2006 | $140,066.00 |
| 2007 | $145,063.00 |
| 2008 | $76,781.00 |
| 2009 | $82,504.00 |
| 2010 | $77,960.00 |
|  | **Total Penalties Assessed: $663,771.00** |

Kronowitz was provided notice of the FBAR penalty assessments, which remain unpaid, and he does not contest the amounts upon which the penalties are based. In addition to the amount of the assessments, interest and failure to pay penalties have accrued. As of October 18, 2019, the date the Government filed the Complaint in this case, the total owed, including interest and assessed penalty fees was $753,680.37.

### III.   CONCLUSIONS OF LAW

In 1970, Congress enacted the Currency and Foreign Transactions Reporting Act, referred to as the Bank Secrecy Act (BSA), 31 U.S.C. §§ 5311, *et seq*. *See* Pub. L. No. 91-508, 84 Stat. 1114 (1970). The primary purpose of the BSA is to require the making of certain reports that "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." *Id*. § 202. To effectuate this purpose, the BSA directs the Secretary of the Department of Treasury to promulgate regulations requiring the reporting of information from United States persons who have relationships, or conduct transactions, with foreign financial agencies. *See id.* § 241(a) (codified at 31 U.S.C. § 5314). As relevant here, the regulations require "each United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country" to file a FBAR. *See* 31 C.F.R. § 1010.350(a). The FBAR

is required "with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." *See* 31 C.F.R. § 1010.306(c).

The authority to assess and collect civil penalties for FBAR requirement non-compliance rests with the IRS. *See* Delegation of Enforcement Authority Regarding the Foreign Bank Account Report Requirements, 68 Fed. Reg. 26489 (May 16, 2003). The BSA did not originally contain a civil penalty provision for failing to comply with the FBAR requirements, *see* Pub. L. No. 91-508, 84 Stat. 1114 (1970), but Congress added one in 1986. *See* Money Laundering Control Act of 1986, Pub. L. No. 99-570, Subtitle H, 100 Stat. 3207, § 1357 (October 27, 1986). FBAR penalties may be either willful or non-willful. *See* 31 U.S.C. § 5321(a)(5).

In this case, the Government assessed a willful penalty, in addition to late payment penalties and accrued interest. In order to be subject to a willful FBAR penalty, the following elements are required: (1) the person must be a U.S. citizen; (2) the person must have or had an interest in, or authority over a foreign financial account; (3) the account had a balance exceeding $10,000.00 at some point during the reporting period; and (4) the person must have willfully failed to disclose the account and file a FBAR. 31 U.S.C. § 5314; 31 C.F.R. § 1010.350(a). The Court reviews the evidence *de novo*. *U.S. v. Williams*, No. 09-437, 2010 WL 3473311, at *1 (E.D. Va. Sep. 1, 2010), *rev'd on other grounds*, 489 F. App'x 655 (4th Cir. 2012) (quoting *Eren v. Comm'r*, 180 F.3d 594, 597-598 (4th Cir. 1999)).

The statutes and regulations at issue in this case do not define the term willful; however, the BSA identifies the applicable penalty as a "civil money penalty." 31 U.S.C. § 5321(a)(5)(A). "[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). "While the term recklessness is not self-defining, the common law

9

has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed 2d 811 (1994)) (internal quotations omitted). In the FBAR context, the United States Court of Appeals for the Eleventh Circuit recently held that "willfulness in the § 5321 includes reckless disregard of a known or obvious risk." *United States v. Rum*, --- F.3d ----, 2021 WL 1589153, at *6 (11th Cir. Apr. 23, 2021).

As such, "when imposing a civil penalty for an FBAR violation, willfulness based on recklessness is established if the defendant (1) clearly ought to have known that (2) there was a grave risk that an accurate FBAR was not being filed and if (3) he was in a position to find out for certain very easily." *Id.* (citing *United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020) (quotations and citation omitted)).

## IV.   DISCUSSION

At the outset, the Court notes that Kronowitz does not dispute the first three elements necessary for the imposition of a willful FBAR penalty. He is a U.S. citizen, he had an interest or authority over foreign financial accounts, and those accounts had balances exceeding $10,000.00 at some point during the relevant reporting periods. Kronowitz also does not dispute that he had an obligation to file FBARs for tax years 2005-2010, or that he failed to timely do so. As such, the only issue remaining is whether Kronowitz's violations were willful.

### A. Evidence of recklessness

In this case, the evidence presented at trial demonstrates that Kronowitz's FBAR violations were willful, in that he recklessly failed to report his interest in his foreign accounts. Kronowitz has been a professional tax return preparer for nearly sixty years, who until recently, prepared

thirty (30) to forty (40) tax returns per year on behalf of individuals and corporations. He admitted to seeing hundreds of Schedule Bs, and being familiar with the purpose of Schedule B and its requirements, but testified that he probably did not read the instructions because he was more concerned with providing for his family and taking care of his clients. Indeed, he testified that "my purpose in life at the time was to get clients, bill them, and collect the money, not spending the whole year reading[.]" Furthermore, Kronowitz affirmatively answered "no" to questions regarding interests in foreign accounts on both his individual tax returns and on the Trust tax returns he prepared. He simply and incorrectly assumed that reporting the gains from his Levy investments would be sufficient to satisfy tax reporting obligations. When asked why he chose to report the gains on the Trust return as opposed to reporting the gains on his personal return, he responded that

> that's where the money went, that's where the money came out to pay the taxes. Okay. From the 1210 Trust. I didn't see any big difference one way or the other. As long as they were reported and the taxes were paid.

He testified further that he now recognizes that to have been a mistake; however, additional evidence belies Kronowitz's assertion that his conduct in this case arose a result of a simple mistake.

Beginning with his investments with Levy, Kronowitz displayed a surprisingly laissez-faire attitude—he simply gave Levy his money and did not ask any questions, even when he was given no receipt or acknowledgment for the funds he invested. He also failed to ask any questions about how his funds would be held for him, or how he might access them if needed. Therefore, the Court does not assign much weight to the fact that Kronowitz did not know that he was the beneficiary of two Swiss bank accounts containing the proceeds from his Levy investments. He did not know because he never asked how Levy would handle his investments or the proceeds they

11

might potentially generate. Moreover, even when he learned that his investments had generated significant gains, he still asked no questions and simply directed the transfer of funds to his Cayman Accounts. Similarly, in reporting the gains on those investments, he simply assumed that putting them on the Trust tax return would be sufficient—he neither did any research, nor did he ask anyone with more expertise if his assumption was correct. In addition, despite preparing hundreds of tax returns and his familiarity with the forms, which contain instructions and questions pertaining specifically to interests in foreign accounts, he never inquired whether his foreign accounts might trigger any additional obligations on his part.

Moreover, the manner in which Kronowitz handled the gains from his Levy investments does not support a finding that he was simply mistaken, as opposed to reckless under the circumstances. Once Kronowitz learned that his investments with Levy had generated significant gains, he gave instructions for the funds to be transferred first to the Caymans, and then to the Trust, rather than directly to the Trust's bank account in the United States. In addition, he admittedly opened the Cayman Accounts to keep assets out of reach of potential creditors, like Mogerman, based upon advice he heard during a CPE course; but without conducting any follow-up to determine the potential tax effects of maintaining offshore accounts. *See* ECF No. [41] at 11, ¶ 27 ("The purpose of opening these [Cayman Accounts] was that if Kronowitz was to be sued for malpractice, such funds could not be reached by the potential creditor."). Kronowitz testified at trial that in connection with the advice he heard regarding moving assets offshore, "[t]hat's when I opened the account in the Caymans and put some money over there. I didn't have a lot, but I put some." And while Kronowitz insists that there was no intent to defraud the IRS, no fraudulent intent is required for a finding of willfulness in the FBAR context.

### B. Affirmative defenses

In response to the Government's claims, Kronowitz asserted four affirmative defenses. *See* ECF No. [9]. Prior to trial, Kronowitz withdrew his defenses based on timeliness (Affirmative Defense No. 1) and the statute of limitations (Affirmative Defense No. 4), *see* ECF No. [18]. In response to the Government's Motion for Summary Judgment, he conceded that the amount of the FBAR penalty is not capped (Affirmative Defense No. 3), *see* ECF No. [28] at 1 n.1. As such, the only remaining defense is that his failure to file FBARs for tax years 2005 through 2010 was not willful or reckless (Affirmative Defense No. 2).

In support of the defense that his failure to file FBARs was not willful or reckless, Kronowitz introduced evidence at trial. That evidence consisted of the testimony of his daughter, Tracy Falkowitz, and his wife, Sybil Kronowitz, that he has experienced significant declines in his health and memory in recent years. However, the evidence does not establish that Kronowitz's declining health affected his behavior during the relevant time period, such that it would support a finding that his violations were not reckless. Although the Court is sympathetic to Kronowitz's recent lapses in memory and additional health complications, there was no medical evidence presented at trial to establish that Kronowitz's cognitive abilities were compromised during the relevant tax years.[3] Rather, the evidence demonstrates that his actions related to the handling of his accounts and the gains from his investments with Levy were purposeful and deliberate.

### V. CONCLUSION

Based upon Kronowitz's background and experiences as a CPA and tax preparer, and the totality of his actions in this case, the Court finds that he clearly ought to have known that there

---

[3] The parties stipulated that "[a] medical professional had not determined whether Kronowitz had, or whether he did not have, a medical or physical impairment, during the period of June 30, 2006 through June 30, 2010." ECF No. [41] at 9, ¶ 16.

was a grave risk that he was failing to comply with the FBAR requirements with respect to his foreign accounts. Furthermore, he was in a position to find out for certain very easily, had he taken the time to either conduct independent research, or consult with another person more knowledgeable on tax law as to whether any additional reporting requirements might apply to him.

Accordingly, the Court finds that Kronowitz's FBAR violations for tax years 2006, 2007, 2008, 2009, and 2010 were willful, and that the Government is entitled to recover willful FBAR penalties for those years. As such, the Government is directed to submit to the Court an updated calculation of damages including all fees and interest applicable, **on or before June 15, 2021**. The Court will enter judgment in favor of the Government by separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on June 3, 2021.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record